UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DONNA MAYS, as Administratrix of the Estate
of Her Son JAMEL FLOYD,

*Plaintiff*,

-against-

UNITED STATES OF AMERICA; JOHN or
JANE DOE 1-30, Correctional Officers and Staff
of the Federal Bureau of Prisons,

*Defendants*.

Civil Action No. 21-3517

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiff Donna Mays, by and through her counsel Emery Celli Brinckerhoff Abady Ward

& Maazel LLP, hereby alleges the following:

**PRELIMINARY STATEMENT**

1.      When Jamel Allen Floyd arrived at the Metropolitan Detention Center in

Brooklyn, New York ("MDC Brooklyn") on October 30, 2019, he was only seven months from

his first parole hearing and less than a year away from his parole eligibility date. He entered

Federal Bureau of Prisons ("BOP") custody that day believing that his next home would be back

with his parents, brother, girlfriend, and extended family, just twenty-five miles away in

Hempstead, New York.

2.      Mr. Floyd was thirty-five years old at the time, he was physically healthy, and

exercised every day. He was studying to obtain his commercial driver license so he could start a

trucking business with his brother. He was looking forward to walking his mother down the aisle

at her wedding after his release.

3.      According to a former warden of the jail facility, over the past decade, the MDC

Brooklyn has established its reputation as "one of the most troubled, if not the most troubled

1

facility" in the BOP system.[1] Over the course of just a few days in late May and early June 2020, Mr. Floyd experienced first-hand the brutal treatment that has given the MDC Brooklyn its reputation.

4.      On May 29, 2020, correctional officers took Mr. Floyd to a staff bathroom—out of the sight of security cameras—and assaulted him, splitting his brow open in the process. When the officers escorted Mr. Floyd out of the unit after the assault, the floor was spattered with a trail of blood. Mr. Floyd had to go to the emergency room to have the laceration on his face closed with stitches. Following this incident, Mr. Floyd was sent to solitary confinement.

5.      In the early morning on June 3, 2020, Mr. Floyd was still in solitary. He began to experience a severe mental health or medical crisis. For hours, he repeatedly pleaded for medical assistance. His calls for help fell on deaf ears. In desperation, Mr. Floyd broke his sink and knocked a hole in his cell window, begging for someone to pay attention.

6.      Instead of assisting Mr. Floyd, dozens of correctional officers flooded the unit where Mr. Floyd was confined. Officers sprayed several canisters of pepper spray directly into his locked cell. This grossly excessive use of force caused Mr. Floyd to collapse and experience a life-threatening heart condition.

7.      As Mr. Floyd lay on the ground, soaked in pepper spray and with his heart beginning to fail, correctional officers opened the cell door, tackled Mr. Floyd, and pinned him to the ground.

8.      Although Mr. Floyd was visibly experiencing a medical crisis, officers failed to provide or summon medical assistance. Instead, they kept Mr. Floyd pinned down, restrained his

---

[1]      Annie Correal & Joseph Goldstein, *'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse*, N.Y. Times (Feb. 9, 2019), http://nytimes.com/2019/09/nyregion/brooklyn-jail-no-heat-inmates.html.

wrists and ankles, and eventually strapped his limp, incapacitated body to a chair designed to immobilize people who are out of control, not people who are dying.

9.      By the time the officers and a medical staff member finally attempted to resuscitate Mr. Floyd while he was still strapped to the restraint chair, it was too little too late. Mr. Floyd never regained consciousness and was pronounced dead that morning at a nearby hospital. After thirty-five years, eight months, and twenty days, Mr. Floyd's life was cut abruptly short by correctional officers who subjected Mr. Floyd to excessive force and then stood by while he slowly died.

10.     Mr. Floyd's death at the hands of Defendants just four months before his parole eligibility date was not only untimely, it was preventable. Defendants' actions were inhumane, contrary to BOP policy, and violated Mr. Floyd's constitutional and statutory rights. Plaintiff Donna Mays now brings this suit to hold Defendants responsible for their outrageous and unlawful treatment of her son, Jamel Floyd.

## JURISDICTION AND VENUE

11.     This case is brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Federal Tort Claims Act, and the Eighth Amendment to the United States Constitution. The Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (United States as defendant).

12.     Venue is proper in the Eastern District of New York because all of the events complained of and giving rise to Plaintiff's claims occurred in this District. *See* 28 U.S.C. §§ 1391(b), 1391(e), 1402(b).

## PARTIES

13.     Jamel Floyd was killed by BOP correctional officers at the MDC Brooklyn, New York on June 3, 2020. All of the events giving rise to the Complaint, including the death of Mr.

Floyd, occurred in Brooklyn, New York. At the time of his death, Mr. Floyd was a citizen of the United States and resided in Brooklyn, New York.

14.     Plaintiff Donna Mays is Mr. Floyd's mother and the Administratrix of his Estate. Ms. Mays is a citizen of the United States and a sixty-one-year-old woman who resides in Nassau County, New York.

15.     Plaintiff is unaware of the true name and capacity, whether individual or otherwise, of Defendants John or Jane Doe 1-30, who are BOP correctional officers and staff, and therefore sues these Defendants by fictitious names.

16.     At all times relevant to the Complaint, Defendants John or Jane Doe 1-30 acted within the scope and course of their employment with the BOP.

17.     The BOP is an agency within the United States Department of Justice ("DOJ").

18.     Plaintiff will amend this Complaint to allege the true names and capacities of Defendants John or Jane Doe 1-30 when they have been ascertained.

19.     At all times relevant to this Complaint, Defendants John or Jane Doe 1-30's employer, the BOP, was an agency of Defendant United States of America, who is liable for the injuries caused by Defendants John or Jane Doe 1-30 pursuant to the Federal Tort Claims Act.

**JURY DEMAND**

20.     Plaintiff demands a trial by jury in this action for all claims for which it is available.

**FACTS**

***Mr. Floyd Is Transferred to MDC Brooklyn in October 2019***

21.     Mr. Floyd grew up in Hempstead on Long Island. He was one of three children of Plaintiff Donna Mays and James Floyd.

4

22.     Mr. Floyd loved sports and was a talented athlete as a child. He completed his GED in November 2001.

23.     Mr. Floyd was thirty-five years old when he entered BOP custody at the MDC Brooklyn on October 30, 2019.

24.      Immediately prior to his arrival at the MDC Brooklyn, Mr. Floyd was incarcerated at Sing Sing Correctional Facility—a state prison operated by the New York State Department of Corrections and Community Supervision.

25.     Mr. Floyd was eligible for his first parole hearing on June 6, 2020. He was eligible for parole starting on October 13, 2020.

26.     Mr. Floyd was looking forward to going home and being reunited with his family in Hempstead after his release.

27.     Mr. Floyd's stay at the MDC Brooklyn was supposed to be temporary: he was transferred to the MDC Brooklyn and held in federal BOP custody on a writ of habeas corpus ad testificandum.

28.     While incarcerated in state prison, Mr. Floyd was prescribed medications to treat high blood pressure; Mitrazapine, an antidepressant; Olanzapine, which is used to treat schizophrenia and bipolar disorder; and multiple asthma medications.

29.     Six days after his arrival at the MDC Brooklyn, on November 5, 2019, Mr. Floyd was evaluated by a nurse employed by BOP Health Services, who noted in his evaluation that Mr. Floyd had a history of hypertension and was "on meds" for the same, had a history of asthma, and had a history of mental health treatment, including for schizophrenia and bipolar disorder.

5

30.　　On April 7, 2020, BOP medical staff stopped administering all medications to Mr. Floyd, including medications for hypertension, schizophrenia, and depression.

31.　　In an April 7, 2020 Administrative Note, a BOP physician explained that Mr. Floyd's "bipolar disorder" and "essential (primary) hypertension" diagnoses were "resolved," and noted that Mr. Floyd's blood pressure had been "normal off meds" and that he was "not hypertensive."

32.　　BOP resumed administering Mr. Floyd's schizophrenia and depression medications on April 30 and May 1, 2020, respectively.

***Mr. Floyd Is Assaulted by Correctional Officers in a Staff Bathroom on Friday, May 29, 2020***

33.　　On Friday, May 29, 2020, Mr. Floyd was housed in a cell with a cellmate in Unit 62 of the MDC Brooklyn.

34.　　At approximately 9:15 p.m. that night, Mr. Floyd was taking a shower in the common shower area outside of his cell when an altercation started between another incarcerated person and BOP correctional officers.

35.　　The correctional officers pulled an emergency alarm and ordered all incarcerated people to return to their cells.

36.　　Mr. Floyd attempted to return to his cell from the shower area at the same time that additional correctional officers arrived at Unit 62 in response to the emergency alarm.

37.　　At approximately 9:20 p.m., Defendants Officers John or Jane Doe 1 and 2 took Mr. Floyd to a nearby staff bathroom in Unit 62 to search him.

38.　　The interior of the staff bathroom was out of view of security cameras in Unit 62.

39.　　Defendants Officers John or Jane Doe 1 and 2 escorted Mr. Floyd into the staff bathroom.

40.     On information and belief, Defendants Officers John or Jane Doe 1 and 2 assaulted Mr. Floyd in the staff bathroom.

41.     On information and belief, Defendants Officers John or Jane Doe 1 and 2 hit Mr. Floyd's eye and mouth, and put pressure on his neck.

42.     When Mr. Floyd emerged from the Unit 62 staff bathroom, he had a visible gash near his eyebrow that was bleeding profusely. Mr. Floyd's face and clothing, and the floor of the unit, were spattered with blood.

43.     Mr. Floyd also suffered a broken tooth during the assault by Defendants Officers John or Jane Doe 1 and 2 in the staff bathroom.

44.     Mr. Floyd was charged with misconduct for possessing a contraband cell phone.

45.     Correctional officers placed Mr. Floyd in handcuffs with his hands behind his back, escorted him out of Unit 62, and took him to Unit 84, where he was separated from MDC's general population.

### Mr. Floyd Is Placed in Solitary Confinement in Unit 84

46.     At all times relevant, Unit 84 at MDC Brooklyn was being used as a Special Housing Unit ("SHU"), and as a quarantine unit.

47.     In the BOP system, SHUs are housing units where incarcerated people are separated from the general population, either alone in solitary confinement or with other individuals.

48.     The night of May 29, 2020, Mr. Floyd was placed in a cell on the bottom tier of Unit 84.

49.     At approximately 10:00 p.m. that same night, a BOP nurse conducted an on-camera medical assessment of Mr. Floyd in the SHU.

50.     The nurse who examined Mr. Floyd's injuries noted that he had lacerations above his right eye and congealed blood on his forehead and around his eyes.

51.     The nurse temporarily bandaged Mr. Floyd's wounds.

52.     Mr. Floyd spent his first night in Unit 84—the night of May 29 to 30—in a cell with his cellmate from Unit 62, who had also been sent to the SHU.

53.     On Saturday, May 30, 2020, Mr. Floyd was taken to Kingsbrook Jewish Medical Center ("Kingsbrook") in Brooklyn for treatment.

54.     Mr. Floyd arrived at Kingsbrook at 4:42 p.m. and received medical treatment for two injuries caused by Defendants Officers John or Jane Doe 1 and 2 the day before: a superficial linear abrasion and a traumatic subconjunctival hemorrhage of his right eye.

55.     The physician who treated Mr. Floyd at Kingsbrook observed that his heart rate and rhythm were normal.

56.     When correctional officers brought Mr. Floyd back to MDC Brooklyn at approximately 7:00 p.m. that same day, they placed Mr. Floyd in solitary confinement on the upper tier of Unit 84.

### *On Wednesday, June 3, 2020, Mr. Floyd Experiences a Medical or Mental Health Crisis; Correctional Officers Respond with Immediate Deadly Force*

57.     From Saturday, May 30, to Wednesday, June 3, 2020, Mr. Floyd was kept in solitary confinement in a cell on the upper tier of Unit 84.

58.     In its policy regarding treatment of persons with mental illness, BOP recognizes that an incarcerated person's "mental health may deteriorate during a restrictive housing placement."[2]

---

[2]     U.S. Dep't of Justice, Federal Bureau of Prisons, *Program Statement – Treatment and Care of Inmates with Mental Illness* 16 (May 1, 2014), https://www.bop.gov/policy/progstat/5310_16.pdf.

59.     In the early morning on Wednesday, June 3, 2020, Mr. Floyd began repeatedly shouting for help and banging on his door from inside his locked cell.

60.     Mr. Floyd repeatedly shouted the following phrases over the next several hours: "Is this personal?" "I need medical attention." "I can't breathe." "Someone is trying to kill me."

61.     Mr. Floyd's cries for help could be heard by other incarcerated people throughout the upper and lower tiers of Unit 84 for several hours that morning, and on information and belief, by the correctional officers on the unit.

62.     At least one correctional officer walked up to Mr. Floyd's cell and told him to be quiet and that there was "nothing wrong with [him]."

63.     Correctional officers in Unit 84 ignored Mr. Floyd's cries for help and his banging on the cell door for several hours.

64.     At approximately 9:09 a.m., a BOP psychologist, Dr. Ortega, walked past Mr. Floyd's cell, but then doubled back and returned to his cell a few seconds later. Dr. Ortega then spoke to Mr. Floyd through the door of the cell for several seconds.

65.     Dr. Ortega failed to document her interaction with Mr. Floyd in his medical chart.

66.     At approximately 9:38 a.m., a correctional officer making rounds stopped at Mr. Floyd's cell and spoke to him through the door of the cell for a few seconds.

67.     At approximately 9:50 a.m., Mr. Floyd removed a piece of hardware from the sink in his cell and used it to break the narrow rectangular cell door window.

68.     Hot water and steam rushed out of the broken sink into Mr. Floyd's cell.

69.     The dimensions of the window on Mr. Floyd's cell door were approximately four inches by twenty inches—too small for Mr. Floyd or any other person to climb through.

70.     In response to Mr. Floyd breaking his cell window, correctional officers sent an emergency call over the MDC radio.

71.     At approximately 9:52 a.m., a large group of correctional officers, including Defendants Officers John or Jane Doe 3-30, assembled outside Mr. Floyd's cell.

72.     Some of the officers were carrying riot shields.

73.     Mr. Floyd cried out that he was not resisting, that he needed medical assistance, and that his chest was hurting.

74.     Mr. Floyd shouted out, "I keep on telling y'all my chest is hurting and y'all are not listening."

75.     Defendants Officers John or Jane Doe 3 and 4 ordered Mr. Floyd to drop the piece of sink hardware out of the broken cell window.

76.     Mr. Floyd complied with this command.

77.     Mr. Floyd dropped the piece of sink hardware out of the broken cell window.

78.     Mr. Floyd remained locked alone in his cell.

79.     Mr. Floyd repeatedly told officers Defendants Officers John or Jane Doe 3-30 that he could not breathe.

80.     Defendants Officers John or Jane Doe 3-30 did not attempt to use a verbal intervention to defuse the situation.

81.     Defendants Officers John or Jane Doe 3-30 did not attempt to enter Mr. Floyd's cell to assist him, or to extract Mr. Floyd from his cell.

82.     Defendants Officers John or Jane Doe 5-7 sprayed multiple canisters of pepper spray directly into Mr. Floyd's locked cell through the meal slot in his door.

83.     The Defendant Officers used the pepper spray at the direction of a BOP Lieutenant John or Jane Doe 8 who was also present outside Mr. Floyd's cell.

84.     On information and belief, Defendant Officer John or Jane Doe 5 sprayed an initial approximately five to ten-second blast of pepper spray through the cell door food slot or broken cell door window, filling Mr. Floyd's cell.

85.     On information and belief, a second officer, Defendant Officer John or Jane Doe 6, then sprayed an additional approximately five to ten-second blast of pepper spray into Mr. Floyd's cell.

86.     On information and belief, a third officer, Defendant Officer John or Jane Doe 7, then sprayed another approximately five to ten-second blast of pepper spray.

87.     Defendant Officers John or Jane Doe 5-8 sprayed so much pepper spray, or caused so much pepper spray to be deployed, into Mr. Floyd's cell that the resulting cloud of the chemical irritant caused incarcerated people and correctional officers throughout the top and bottom tiers of Unit 84 to cough and gag.

88.     At least one correctional officer vomited as a result of the pepper spray.

89.     Several incarcerated individuals throughout the Unit placed wet towels under their cell doors or t-shirts around their faces to protect themselves from the spreading cloud of pepper spray.

90.     At no time during the use of force against Mr. Floyd did Defendants Officers John or Jane Doe 3-30 or any other staff obtain a handheld video camera or record these events.

***Mr. Floyd Experiences Cardiac Arrest; Correctional Officers Ignore Mr. Floyd's Obvious Medical Emergency, Pin Him to the Ground, and Strap His Dying Body to a Restraint Chair***

91.     As Defendants Officers John or Jane Doe 5-8 doused Mr. Floyd and his cell in pepper spray, Mr. Floyd immediately began loudly coughing, gagging, and choking.

11

92.     Mr. Floyd immediately collapsed and fell to the floor.

93.     Upon information and belief, the enormous amount of pepper spray caused Mr. Floyd to experience a life-threatening abnormal heart rhythm.

94.     After Mr. Floyd collapsed, Defendant Officer John or Jane Doe 9 yelled, "he's on the ground."

95.     Mr. Floyd never stood up again.

96.     Upon information and belief, after they sprayed Mr. Floyd and he collapsed to the ground, the Defendants Officers John or Jane Doe 3-30 waited approximately two minutes before they opened the door to Mr. Floyd's cell.

97.     Throughout this time, Mr. Floyd was lying incapacitated on the floor of his cell.

98.     When correctional officers finally opened the door to Mr. Floyd's cell, Mr. Floyd was lying on the cell floor, shaking and convulsing.

99.     Ignoring Mr. Floyd's clear medical emergency, a group of approximately five correctional officers, Defendants Officers John or Jane Doe 10-15, entered Mr. Floyd's cell, tackled him, repeatedly yelled "stop resisting," jumped on him, and pinned him to the ground.

100.    When Defendants Officers John or Jane Doe 10-15 tackled Mr. Floyd, jumped on him, and pinned him to the ground, they caused bruises all over Mr. Floyd's body, including on his right forearm below the elbow, both hands, the right side of his lower back, the back of both legs, and on his head.

101.    Defendants Officers John or Jane Doe 10-15 caused scraping on Mr. Floyd's cheeks and knees when they tackled him and pinned him in a facedown or prone position.

102.     Upon information and belief, by the time Defendants Officers John or Jane Doe 10-15 entered Mr. Floyd's cell, he was visibly unresponsive and required immediate cardiopulmonary resuscitation ("CPR") in order to survive.

103.     After Defendants Officers John or Jane Doe 10-15 tackled and pinned Mr. Floyd to the ground, Defendant Officer John or Jane Doe 10 yelled that he could not find Mr. Floyd's pulse.

104.     Upon information and belief, as a thirty-five-year-old man with no prior heart disease, Mr. Floyd had an excellent chance of being resuscitated if CPR had been performed immediately after the correctional officers discovered that Mr. Floyd did not have a pulse.

105.     However, when a person experiences ventricular fibrillation cardiac arrest, their chance of survival decreases by 7-10% for every minute they do not receive CPR.[3]

106.     After Defendant Officer John or Jane Doe 10 yelled that he could not find Mr. Floyd's pulse, Defendants Officers John or Jane Doe 10-15 did not immediately call for medical assistance, although a trained BOP health technician, Hygor Lopes, was present at the unit.

107.     Defendants Officers John or Jane Doe 10-15 did not attempt to perform CPR on Mr. Floyd themselves, even though they were all trained in CPR.

108.     By then, Defendants Officers John or Jane Doe 10-15 had observed and knew that Mr. Floyd was variously convulsing, experiencing a medical crisis, unconscious, and pulse-less.

109.     Defendants Officers John or Jane Doe 10-15 picked up Mr. Floyd's body by his legs, arms, and hair, and dragged him out of his cell.

110.     After dragging him out of his cell, Defendants Officers John or Jane Doe 10-20 kept Mr. Floyd pinned to the ground while they placed him in wrist and ankle restraints.

---

[3]     Larsen et al., *Predicting survival from out-of-hospital cardiac arrest: a graphic model*, Ann. Emerg. Med. (Nov. 1993), http://pubmed.ncbi.nlm.gov/8214853.

111.    The BOP regulation that governs the use of restraints by correctional officers, 28 C.F.R. § 552.20, states that restraints may be temporarily used "to prevent [an] inmate from hurting self, staff, or others, and/or to prevent serious property damage."

112.    When Defendants Officers John or Jane Doe 10-20 placed Mr. Floyd in wrist and ankle restraints, he was completely incapacitated, in a cardiac emergency, and was not a threat to hurt himself, staff, or others, or causing any property damage.

113.    After they placed Mr. Floyd in restraints, Defendants Officers John or Jane Doe 10-20 called for other officers to bring a restraint chair to the scene.

114.    According to the DOJ Civil Rights Division, a restraint chair "uses straps and belts to secure a person's arms, legs, and torso in an upright sitting position in the chair" and "is used to restrain a violent, out-of-control inmate."[4]

---

[4]     U.S. Dep't of Justice, Civil Rights Div., *Investigation of the Boyd County Detention Center (Catlettsburg, Kentucky)* 7 (Feb. 28, 2019), https://www.justice.gov/crt/case-document/file/1135696/download.



115.    When the correctional officers called for a restraint chair, Mr. Floyd was neither violent nor out of control—he was unresponsive and experiencing a life-threatening cardiac emergency.

116.    Defendants Officers John or Jane Doe 10-20 kept Mr. Floyd's body pinned to the floor until the restraint chair arrived.

117.    Mr. Lopes, the BOP paramedic, was present in Unit 84 at this time, although he was separated from Mr. Floyd by the large scrum of dozens of correctional officers, including Defendants John or Jane Doe 3-30.

118.     Defendants Officers John or Jane Doe 3-30 either failed to summon the paramedic, Mr. Lopes, to resuscitate Mr. Floyd, or prevented Mr. Lopes from aiding Mr. Floyd, while the correctional officers kept Mr. Floyd pinned to the ground and restrained.

119.     Defendants Officers John or Jane Doe 3-30 delayed medical treatment and wasted critical minutes by applying restraints to Mr. Floyd and procuring a restraint chair for his transport, rather than immediately starting CPR at the scene or taking any other life-saving measures.

120.     At approximately 9:59 a.m., correctional officers arrived with the restraint chair to where Defendants Officers John or Jane Doe 10-20 had Mr. Floyd's body pinned to the floor.

121.     When the restraint chair arrived, Defendants Officers John or Jane Doe 10-20 strapped Mr. Floyd's legs, arms, and shoulders to the chair.

122.     While Defendants Officers John or Jane Doe 10-20 strapped Mr. Floyd's limp body to the restraint chair, it was or should have been obvious and apparent to them that Mr. Floyd was experiencing a medical emergency: he was visibly unresponsive, his body was twitching involuntarily, his tongue was hanging out of his open mouth, and his head was slumped over to one side.

123.     Several of Defendants Officers John or Dane Doe 10-20 continued to yell "stop resisting" at Mr. Floyd while they strapped him to the restraint chair.

124.     Because Mr. Floyd was unresponsive, his head flopped forward while the officers tried to strap him to the chair.

125.     Defendant Officer John or Jane Doe 16 pulled back on Mr. Floyd's hair to secure his limp head in place while Defendant Officer John or Jane Doe 17 strapped Mr. Floyd's head to the chair.

126.    At least one incarcerated person who was observing the correctional officers while they were strapping Mr. Floyd to the chair yelled, "he looks like he's dead, he needs medical."

127.    Only after Defendants Officers John or Dane Doe 10-20 finished strapping Mr. Floyd's dying body to the restraint chair did they allow Mr. Lopes to approach Mr. Floyd to attempt to provide medical assistance.

128.    Mr. Lopes approached Mr. Floyd and observed what had already been obvious to Defendants Officers John or Jane Doe 3-30 for close to ten minutes at that point: Mr. Floyd was unresponsive, not breathing, and did not have a noticeable pulse.

129.    Mr. Lopes directed Defendants Officers John or Jane Doe 3-30 to move Mr. Floyd from the top tier of Unit 84 to the hallway area downstairs at the bottom of the Unit.

130.    At approximately 10:02 a.m., five of Defendants Officers John or Jane Doe 3-30 wheeled Mr. Floyd to the stairs and then carried him down the stairs while he was still strapped to the restraint chair.

131.    While the five correctional officers were carrying Mr. Floyd down from the top tier of Unit 84, Mr. Lopes instructed a correctional officer to start chest compressions.

132.    That was the first time anyone attempted CPR on Mr. Floyd that morning, at approximately 10:02 a.m.

133.    In accordance with Mr. Lopes's orders, the correctional officer started pumping Mr. Floyd's chest while Mr. Floyd was being carried downstairs in the restraint chair.

134.    The American Heart Association ("AHA") recommends that CPR "should generally be conducted where the victim is found, as long as high-quality CPR can be administered safely and effectively in that location."[5]

135.    Defendants Officers John or Jane Doe 3-30 and all other BOP staff in the unit failed to perform CPR on Mr. Floyd in his cell—the location where he was found suffering a traumatic cardiac event.

136.    When the correctional officer started chest compressions on Mr. Floyd while he was being carried down from the top tier of Unit 84, Mr. Floyd was still in a seated position, strapped to the restraint chair.

137.    But it was too little and far too late. This first attempt to resuscitate Mr. Floyd while he was strapped to the moving restraint chair in a seated position was improperly administered. According to the AHA, "[i]t is preferred to perform CPR on a firm surface and with the victim in the supine position, when feasible."[6]

138.    After the correctional officers removed Mr. Floyd from Unit 84 and brought him to the hallway outside the Unit, they moved him to a stretcher at approximately 10:04am.

139.    Defendants Officers John or Jane Doe 3-30 unnecessarily shackled Mr. Floyd to the stretcher by his arm and legs.

140.    According to BOP records, after Mr. Floyd had been removed from Unit 84 and transferred from the restraint chair to the stretcher, BOP staff summoned Emergency Medical Services ("EMS").

---

[5]      American Heart Association, *Resuscitation Science – 3: Adult Basic and advanced Life Support*, https://cpr.heart.org/en/resuscitation-science/cpr-and-ecc-guidelines/adult-basic-and-advanced-life-support.
[6]      *Id.*

141.    According to NYU Bellevue EMS records, EMS was first called for an ambulance at 10:09 a.m.

142.    An ambulance arrived at MDC Brooklyn at approximately 10:12 a.m.

143.    According to the EMS paramedics who responded to the call, Mr. Floyd "was down for 20 minutes prior to EMS arrival."

144.    Upon arrival at MDC Brooklyn, the EMS paramedics spoke with Defendant Officer John or Jane Doe 18, who "stated that [Mr. Floyd] was in excited delirium upstairs."

145.    This was not true. By the time EMS arrived at MDC Brooklyn, Mr. Floyd had already been unresponsive for close to twenty minutes.

146.    The EMS paramedics first made contact with Mr. Floyd at 10:17 a.m. at the sally port—the secure prison entrance–inside the prison.

147.    When EMS paramedics first checked Mr. Floyd's condition, they observed that his heart rhythm was asystole—the most serious form of cardiac arrest.

148.    The ambulance left MDC Brooklyn with Mr. Floyd at 10:33 a.m.

149.    While on the way to the hospital, EMS paramedics administered multiple rounds of epinephrine and Mr. Floyd's heart began irregularly beating.

150.    Paramedics once again used an ECG to check Mr. Floyd's heart condition, which showed ventricular fibrillation requiring three shocks. The paramedics shocked Mr. Floyd three times with a defibrillator while administering CPR but were unable to revive him.

151.    The ambulance arrived at NYU Langone Hospital–Brooklyn at 10:37 a.m.

152.    Mr. Floyd was pronounced dead at the hospital at 11:07 a.m.

***Throughout Their Assault of Mr. Floyd on June 3, 2020, Defendants Repeatedly Violated the BOP's Use of Force and Pepper Spray Policies***

153.    The federal regulation governing BOP correctional officers' use of force, 28

C.F.R. § 552.20, states the following:

> The Bureau of Prisons authorizes staff to use force only as a last
> alternative after all other reasonable efforts to resolve a situation
> have failed. When authorized, staff must use only that amount of
> force necessary to gain control of the inmate, to protect and ensure
> the safety of inmates, staff, and others, to prevent serious property
> damage and to ensure institution security and good order.

154.    Defendants Officers John or Jane Doe 3-30 failed to use all other reasonable

efforts to resolve the situation before they used force on Mr. Floyd.

155.    Defendants Officers John or Jane 3-30 instead used grossly excessive amounts of

force on Mr. Floyd, who was experiencing a medical or mental health emergency and needed

assistance.

156.    The 2017 BOP policy authorizing use of pepper spray in the federal prison system

states that pepper spray "will be used to protect staff, inmate(s), and others from an inmate(s) or

visitors posing a threat and when other methods of control are not effective."[7]

157.    The BOP pepper spray policy explains:

> Prior to any OC aerosol spray being used, staff must attempt verbal
> intervention to defuse the situation when feasible. Good
> communication skills can frequently eliminate the need for an
> elevated response. The [BOP] authorizes staff to use force only as a
> last alternative after all other reasonable efforts to resolve a situation
> have failed.[8]

158.    Defendants Officers John or Jane Doe 3-30 failed to use other methods of control

or make any reasonable efforts to resolve the situation before deploying pepper spray into Mr.

Floyd's locked cell.

---

[7]       U.S. Dep't of Justice, Federal Bureau of Prisons, *Program Statement – Oleoresin Capsicum (OC) Aerosol Spray* 2 (Feb. 6, 2017), http://bop.gov/policy/progstat/5576_004.pdf (hereinafter "BOP Pepper Spray Policy").
[8]       *Id.* at 3.

159.    The BOP's pepper spray policy also states that correctional officers may spray "one, two-second burst" of pepper spray at a person, and may spray only one additional two-second burst at the person if he or she "does not submit to restraints and/or comply with staff orders within 15 seconds." If the second two-second blast of pepper spray does not cause the person to comply, correctional officers must then use "alternative methods to control the situation."[9]

160.    Defendants Officers John or Jane Doe 3-30 used substantially more pepper spray on Mr. Floyd than is permitted under the BOP's policy, including spraying bursts of longer duration and without breaks.

161.    The BOP's pepper spray policy further states that "[w]hen an immediate use of force is necessary . . . staff are obligated to obtain a camera and begin recording consistent with the Program Statement Use of Application of Restraints. As soon as control of the situation has been obtained, staff must record information on injuries; circumstances that required the need for immediate use of force; and identifications of the inmates, staff, and others involved."[10]

162.    Defendants Officers John or Jane Doe 3-30 failed to obtain a camera and record any of the events leading to Mr. Floyd's death.

163.    Defendants Officers John or Jane Doe 3-30 both knew of and disregarded an excessive risk to Mr. Floyd's health but also caused the risk and continued to do so in the face of obvious evidence that they were causing serious harm.

***Administrative Filing***

164.    On December 3, 2020, Plaintiff served a Standard Form 95 and exhibits on the BOP, seeking administrative relief for her son's death.

---

[9]     *Id.* at 4.
[10]    *Id.* at 4.

165.     On April 23, 2020, the BOP acknowledged that it had received Plaintiff's claim on December 11, 2020.

166.     More than six months have passed since the submission of Plaintiff's claims. As of the date of this Complaint, the United States has made no attempt to settle or resolve this claim.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Eighth Amendment
Excessive Force
(Against Defendants John or Jane Doe 1-30)

167.     Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

168.     Defendants Officers John or Jane 1 and 2's assault upon Mr. Floyd on May 29, 2020, by striking him in the face and neck, was unauthorized, unlawful, and applied maliciously and sadistically to cause Mr. Floyd physical injury.

169.     Defendants Officers John or Jane Doe 3-30's assault upon Mr. Floyd on June 3, 2020, by pepper spraying him for a combined approximately fifteen to thirty seconds while he was confined in his locked cell, and subsequently tackling him, pinning him to the ground, and strapping him to a restraint chair while he was visibly incapacitated and experiencing cardiac arrest, was unauthorized, unlawful, and applied maliciously and sadistically to cause Mr. Floyd physical injury.

170.     Defendants Officers John or Jane Doe 3-30's assault upon Mr. Floyd on June 3, 2020 occurred in the presence of dozens of other Defendant correctional officers. Each of these Defendants wantonly, recklessly, and with depraved indifference to human life failed to (i) aid Mr. Floyd, and/or (ii) stop the Defendant correctional officers from violently assaulting Mr. Floyd, and/or (iii) otherwise intervene on his behalf.

22

171.     Defendant Officers Defendants John or Jane Doe 1-30, in assaulting Mr. Floyd

and in failing to protect Mr. Floyd, inflicted a cruel and unusual punishment against Mr. Floyd in

violation of his rights under the Eighth Amendment to the United States Constitution for which

Plaintiff asserts a claim and seek damages under *Bivens v. Six Unknown Named Agents*, 403 U.S.

388 (1971).

172.     As a direct and proximate result of Defendants' misconduct detailed above, and of

Defendants' violation of Mr. Floyd's constitutional rights, Mr. Floyd suffered physical injury,

severe pain, emotional injury, and death. Accordingly, Plaintiff is entitled to compensatory and

punitive damages against Defendants Officers John or Jane Doe 1-30 jointly and severally.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Eighth Amendment
Deliberate Indifference to Serious Medical Needs
(Against Defendants John or Jane Doe 3-30)

173.     Plaintiff realleges and incorporates by reference each allegation contained in the

preceding paragraphs as if fully set forth herein.

174.     After Defendant Officers John or Jane Doe 5-8 sprayed Mr. Floyd with pepper

spray for a combined approximately fifteen to thirty seconds, Mr. Floyd began to experience

cardiac arrest, an urgent medical condition that carried a high risk of death, degeneration, and/or

extreme pain.

175.     This high risk of death, degeneration, and or/extreme pain was obvious or known

to Defendants Officers John or Jane Doe 3-30, who observed Mr. Floyd collapse and become

incapacitated in his cell, and were subsequently made aware that Mr. Floyd did not have a

noticeable pulse.

176.     By failing to immediately summon medical attention, such as the paramedic on

the scene, Mr. Lopes, to resuscitate Mr. Floyd, or by otherwise preventing medical staff such as

Mr. Lopes from immediately aiding Mr. Floyd, all while the correctional officers kept Mr. Floyd pinned to the ground and restrained in a restraint chair, Defendants Officers John or Jane Doe 3-30 knew of and disregarded an excessive risk to Mr. Floyd's health in the face of obvious evidence that they had caused and were causing serious harm to Mr. Floyd.

177.     The failure of Defendants Officers John or Jane Doe 3-30, and others, to provide Mr. Floyd with adequate treatment for the injuries he sustained on June 3, 2020, including his cardiac arrest, demonstrated deliberate indifference towards Mr. Floyd's serious medical condition, constituting cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

178.     As a direct and proximate result of Defendants Officers John or Jane Doe 3-30 misconduct detailed above, and of Defendants' violation of Mr. Floyd's constitutional rights, Mr. Floyd suffered physical injury, severe pain, emotional injury, monetary damages, and death. Accordingly, Plaintiff is entitled to compensatory and punitive damages against Defendants John or Jane Doe 1-30 jointly and severally.

### THIRD CAUSE OF ACTION
Federal Tort Claims Act
Battery
(Against Defendant United States)

179.     Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

180.     Defendants Officers John or Jane Does 1-30 were all law enforcement officers of the United States Government, and as such, the United States is liable, *inter alia*, for their battery of Mr. Floyd. *See* 28 U.S.C. § 2680(h).

181.     By reason of the foregoing attacks on May 29, 2020 and June 3, 2020, by striking Mr. Floyd, by intentionally spraying Mr. Floyd with three multi-seconds bursts of pepper spray,

and by tackling Mr. Floyd and pinning him to the ground when he was experiencing a cardiac event, the Correctional Officer Defendants committed a willful, unlawful, unwarranted, unauthorized, and intentional battery upon Mr. Floyd.

182.    The battery committed by the Correctional Officer Defendants was contrary to BOP policy and unnecessary and unwarranted in the performance of their duties as BOP correctional officers and employees, and constitute unreasonable and excessive use of force.

183.    Defendants Officers John or Jane Does 1-30 were at all times relevant to this Complaint acting in their capacities as BOP officers and employees, and within the scope and course of their employment by the BOP, an agency of the United States government.

184.    A private employer would otherwise be liable for the negligence of Defendants Officers John or Jane Doe 1-30. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

185.    As a direct and proximate result of the Correctional Officer Defendants' misconduct detailed above, Mr. Floyd suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

**FOURTH CAUSE OF ACTION**
Federal Tort Claims Act
Wrongful Death
(Against Defendant United States)

186.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

187.    As a direct and proximate result of the Correctional Officer Defendants' misconduct detailed above, Mr. Floyd suffered physical injury, severe pain and suffering, and death.

188.     As a direct and proximate result of the Correctional Officer Defendants'
misconduct detailed above, the statutory distributees of Mr. Floyd's estate sustained pecuniary
and non-economic loss resulting from the loss of Mr. Floyd's love, comfort, society, attention,
services, income, support, and life.

189.     Defendant the United States is liable for the wrongful death of Mr. Floyd.

**FIFTH CAUSE OF ACTION**
Federal Tort Claims Act
Negligence – Failure to Provide Adequate Medical Care
(Against Defendant United States)

190.     Plaintiff realleges and incorporates by reference each allegation contained in the
preceding paragraphs as if fully set forth herein.

191.     At all relevant times pursuant to this Complaint, Defendant United States owed a
duty to Mr. Floyd to meet the standard of care owed to incarcerated people. The standard of care
required, among other things, prompt and immediate treatment of Mr. Floyd's emergency
medical conditions.

192.     At all relevant times pursuant to this Complaint, Defendant United States failed to
uphold this duty to Plaintiff.

193.     By failing to respond to Mr. Floyd's repeated requests for medical assistance
throughout the morning of June 3, 2020, the Defendants John or Jane Doe 3-30 demonstrated a
complete disregard for Mr. Floyd's life and safety, and thereby breached the duty owed to Mr.
Floyd.

194.     By failing to summon or denying Mr. Floyd access to immediate medical care
after Mr. Floyd collapsed in his cell at approximately 9:52 a.m. on June 3, 2020, Defendants
Officers John or Jane Doe 3-30 further demonstrated a complete disregard for Mr. Floyd's life
and safety, and thereby breached the duty owed to Mr. Floyd.

195.    The actions of Defendants Officers John or Jane Doe 3-30 represent a gross deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment.

196.    Defendants Officers John or Jane Doe 3-30 were at all times relevant to this Complaint acting in their capacities as BOP officers and employees, and within the scope and course of their employment by the BOP, an agency of the United States government.

197.    A private employer would otherwise be liable for the negligence of Defendants Officers John or Jane Doe 3-30. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

198.    Defendant United States' breach of its duty of care to Mr. Floyd was the proximate cause of Mr. Floyd's serious and unnecessary injuries, including severe pain and suffering and death.

199.    As a direct and proximate result of Defendants' misconduct detailed above, Mr. Floyd has suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

## **RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

1.  Damages, including compensatory and punitive damages, in an amount to be proven at trial.

2.  Reasonable costs and reasonable attorneys' fees pursuant, *inter alia*, to the Equal Access for Justice Act 28 U.S.C. § 2412; and

3.  Such other relief as the Court deems just and equitable.

Dated:  June 23, 2021
       New York, New York

                                       EMERY CELLI BRINCKERHOFF
                                       ABADY WARD & MAAZEL LLP

                                       /s/
                                       Katherine Rosenfeld
                                       Nick Bourland

                                       600 Fifth Avenue, 10th Floor
                                       New York, New York 10020
                                       (212) 763-5000

                                       *Attorneys for Plaintiff*